UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| CHARLES SCOTT BENSON,<br><br>   Plaintiff,<br><br> vs.<br><br>WELLS FARGO BANK, N.A.,<br><br>   Defendant. | CIV. 16-5061-JLV<br><br>ORDER |

**INTRODUCTION**

  This case originated in a job loss. Defendant Wells Fargo Bank, N.A., fired plaintiff Charles Scott Benson pleading compliance with federal banking law as the reason. Plaintiff sued in South Dakota state court, alleging his termination constituted various state law tort violations. Defendant removed the case to this court on the basis of federal question jurisdiction after plaintiff amended his complaint to allege a violation of the Fair Credit Reporting Act ("FCRA"). Now pending before the court is defendant's motion for summary judgment on all counts. (Docket 47). Defendant also seeks to exclude testimony by plaintiff's expert Mark Riley. (Docket 45). Plaintiff vigorously contests these motions. (Dockets 57 & 68). For the reasons given below, the court concludes plaintiff lacks standing to pursue his FCRA claim and remands the remaining state law tort claims to the state court. The court grants defendant's motion for summary judgment in part and denies it in part. The court further denies defendant's motion to exclude Mr. Riley's expert testimony as moot.

**ANALYSIS**

**I.  Facts**

The following recitation consists of the material facts developed from the amended complaint (Docket 35), defendant's answer (Docket 37), defendant's statement of undisputed material facts (Docket 71), plaintiff's response to those facts (Docket 55), and other evidence in the record where indicated.  These facts are "viewed in the light most favorable to the [party] opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The facts material to defendant's motion for summary judgment are as follows.

**A.  Theft conviction and employment**

In July 1992, plaintiff was convicted of theft in the fourth degree in Iowa. (Docket 58 at ¶ 4).  This theft conviction carried a maximum penalty of one year in jail and a $1,000 fine.  Id. at ¶ 5.  In 1998, plaintiff was hired by U.S. Bank as a Personal Bank/Investment Representative.  Id. at ¶ 7.  In a deposition, plaintiff testified he was fired from that job in 2000 "because of FDIC regulation" and that during his termination, his manager discussed his failure to disclose his Iowa conviction.  (Docket 52-4 at p. 3).

After his termination from U.S. Bank, plaintiff was employed by three related home mortgage companies under the name Blue Ribbon.  (Docket 60-1 at p. 3).  He held between a 33 percent and 50 percent ownership interest in these companies.  Id.  Plaintiff was also involved in other mortgage companies during that time.  Id. at p. 5.  In 2006 and 2007, plaintiff and Wells Fargo

employees explored the possibility of plaintiff joining Wells Fargo's Home Mortgage division. (Dockets 58 at ¶¶ 10, 12 & 52-6).[1] Plaintiff contends he told multiple Wells Fargo employees about his Iowa theft conviction during this period. Wells Fargo employees Paul Olsen and Ryan Niesent, who recruited plaintiff, testified plaintiff told them about his conviction. (Dockets 60-2 at p. 2. & 60-3 at p. 2).

In September 2007, Wells Fargo offered plaintiff a job in its Home Mortgage Division with an employment offer letter. (Docket 58 at ¶ 12). The offer letter stated it did not "constitute a contract of employment" and the employment would be "on an at-will basis. . . . contingent upon satisfactory completion of . . . a background check." (Docket 52-6 at p. 4). Plaintiff signed and returned this letter. (Docket 58 at ¶ 15). He also signed a separate background check authorization. Id. at ¶ 16. Plaintiff was not fingerprinted during this background check. Id. at ¶ 17; Docket 52-4 at p. 8.[2] The background check did not show any criminal history. (Dockets 58 at ¶ 18 & 52-7).

After accepting the job offer, plaintiff completed an electronic employment application in November 2007. (Dockets 58 at ¶ 19 & Docket 52-8). On that

---

[1]Plaintiff denied paragraph 12 of defendant's statement of undisputed facts but appears only to contest the second and third sentences of that paragraph which discuss the content of conversations during the recruiting process. He does not appear to contest the recruiting itself occurred.

[2]Plaintiff objected to paragraph 17 of defendant's statement of undisputed facts on the basis it was "irrelevant and immaterial." (Docket 58 at ¶ 17). The court finds relevant all facts it recites in this order. To the extent plaintiff objects on relevance grounds to any facts in this order, those objections are overruled.

application, plaintiff clicked the "yes" button to a question stating he had been involuntarily discharged from a job. (Docket 58 at ¶ 20). In the explanation box, plaintiff wrote he was "licensed for investments and the background check turned up a misdemeanor from when I was a teenager. I didn't disclose it on my initial application for employment." Id. Plaintiff also indicated he had been "convicted of any crime involved dishonest [sic.] or breach of trust such as theft[.]" Id. He explained he "was charged with misdemeanor theft when [he[ was a teenager." Id.

### B. Background check and termination

In 2008, Congress enacted the Secure and Fair Enforcement for Mortgage Licensing Act, commonly known as the "SAFE Act." 12 U.S.C. § 5101 *et seq.* The SAFE Act requires all "loan originators" to register in a national directory. Id. at § 5103(a)(1). As a part of that registration process, loan originators had to submit information regarding "[c]onvictions of any criminal offense involving dishonesty." 12 C.F.R. § 208.103(d)(1)(iii). Loan originators also had to provide their fingerprints and any other information necessary for the Federal Bureau of Investigation ("FBI") to complete a background check. Id. at § 208.103(d)(1)(ix). The parties agree plaintiff was a loan originator governed by the SAFE Act. (Docket 58 at ¶ 23). The parties also agree the SAFE Act required defendant to register loan originators between January and July of 2011. Id. at ¶ 24.

As a part of the SAFE Act registration process, in January 2011 plaintiff authorized defendant to procure "an investigative consumer report," including a criminal background check.  Id. at ¶ 29; Docket 52-9.  First Advantage Enterprise Screening Corporation ("First Advantage"), a separate company, investigated plaintiff and compiled the report.  (Dockets 58 at ¶ 34, 13, & 74 at ¶¶ 5-6).  As a part of this process, First Advantage sent plaintiff's fingerprints to the FBI.  (Docket 74 at ¶ 6).  The FBI sends its background check report directly to Wells Fargo, which then immediately forwards it to First Advantage.  Id.; Docket 71 at ¶ 33).[3]  Wells Fargo does not outsource any employment eligibility decisions to First Advantage.  (Docket 74 at ¶ 5).  Wells Fargo employees instead review the information provided by First Advantage to determine employment eligibility.  Id. at ¶ 7.  The First Advantage report did not show plaintiff's conviction.  (Dockets 58 at ¶ 35 & 13).  However, the FBI report showed the conviction.  (Dockets 58 at ¶ 32 & 52-12).

First Advantage sent a package to plaintiff containing its report, the FBI report, a letter from Wells Fargo stating his continued employment "may be based, in whole or in part, on" the provided materials, a summary of plaintiff's FCRA rights, and a copy of the regulation allowing the subject of an FBI record to challenge the record's contents.  (Dockets 58 at ¶ 38 & 52-14).  Defendant received these materials before February 15, 2011.  Id. at ¶ 39.  On that date,

---

[3]Plaintiff objected to paragraph 33 of defendant's statement of undisputed facts as irrelevant but did not contend it was factually inaccurate.  (Docket 58 at ¶ 33).

5

plaintiff's supervisor Richard Brown terminated him. (Docket 77 at ¶ 44). The reason for the termination is somewhat disputed. During his deposition, plaintiff testified Wells Fargo fired him "as a result of the background check[.]" (Docket 52-4 at p. 9). In its response to defendant's statement of undisputed facts, plaintiff contends he was fired because he did not pass the background check and because he was not "bondable" or could not get a "MLSR number." (Docket 58 at ¶ 44). In support of his argument, plaintiff cites to a portion of a deposition that is not in the record. Id. However, the parties agree the 2011 background check played a part in the termination.

In June 2011, defendant offered to rehire plaintiff on the same terms as his prior employment. Id. at ¶ 48; Docket 52-19 at p. 10. In his deposition, plaintiff's supervisor testified the offer was contingent upon plaintiff dismissing his state court lawsuit. (Docket 60-22 at p. 2). Defendant suggests the reason for its renewed job offer was that plaintiff's theft conviction fell within a newly promulgated regulatory exception for certain *de minimis* convictions. (Docket 58 at ¶ 48). Plaintiff rejected the job offer. Id. at ¶ 49. In an interrogatory prepared for this litigation, plaintiff stated he rejected the offer because he "no longer trusted Wells Fargo as an employer." (Docket 52-19 at p. 10).

### C. Procedural history

On March 18, 2011, plaintiff filed suit against defendant in South Dakota state court. (Docket 14-3). In his initial complaint, plaintiff alleged defendant's conduct with regard to his employment and termination constituted

breach of contract, promissory estoppel, fraud (including fraudulent inducement and concealment), negligent misrepresentation, as well as intentional and negligent infliction of emotional distress. Id. In two 2014 orders, the state court granted defendant summary judgment on plaintiff's intentional infliction of emotional distress and breach of contract claims. (Dockets 52-21 & 52-22). The state court did not give any reasoning for its decision in the written orders. Id. In June 2016, the state court permitted plaintiff to amend his complaint. (Docket 14-1). Plaintiff promptly did so, alleging defendant violated the FCRA and the Racketeer Influenced and Corrupt Organizations Act ("RICO Act"). (Docket 14-4).

Defendant timely removed the amended complaint to this court. (Docket 1). It asserted federal question jurisdiction existed because of plaintiff's FCRA and RICO claims. Id. at ¶ 7. Defendant then moved to dismiss plaintiff's FCRA and RICO claims. (Docket 5). The court ordered the parties to brief the question of standing. (Docket 27). Following that briefing, the court granted defendant's motion to dismiss plaintiff's RICO claim and allowed plaintiff to proceed with the FCRA claim. (Docket 33). The court concluded plaintiff had standing to litigate his FCRA claim. Id. at pp. 5-18. The court also permitted plaintiff to amend his complaint. Id. at pp. 38-43. The second amended complaint alleges plaintiff's state law tort claims—including the intentional infliction of emotional distress and breach of contract claims dismissed by the state court—and violations of the FCRA. (Docket 35).

## II. Defendant's Motion for Summary Judgment

Defendant's motion for summary judgment differentiates between plaintiff's tort claims and his FCRA claim. It argues § 19 of the Federal Deposit Insurance Act, 12 U.S.C. § 1829, preempts plaintiff's tort claims. (Docket 72 at pp. 5-16).[4] On the FCRA claim, defendant contends its 2011 background check of defendant did not involve a consumer report governed by the FCRA. Id. at pp. 17-24. Alternatively, defendant asserts it is not liable for any FCRA violation it may have committed because the violations were not willful. Id. at pp. 24-26. Finally, in a footnote and a supplemental letter brief, defendant again questions plaintiff's standing to bring the FCRA claim. Id. at p. 24 n.8; see also Docket 82. Because federal question jurisdiction is premised on the FCRA claim, the court first addresses that claim. The court determines plaintiff lacks standing to pursue his FCRA claim and remands the remaining claims to the state court.

### A. Legal standard for summary judgment

Under Federal Rule of Civil Procedure 56(a), a movant is entitled to summary judgment if the movant can "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[4]Defendant moved to seal its summary judgment brief on the grounds it contained "private personal information and confidential business information." (Docket 51 at p. 2). It also filed a redacted version of the brief. (Docket 48). A comparison of the two documents shows defendant redacted only information about plaintiff's theft conviction. Plaintiff did not move to seal any documents discussing his conviction. Accordingly, the court sees no reason to file this order under seal. A reader without access to the sealed brief should know any citations to the sealed brief are accurate in reference to the redacted brief as well.

Fed. R. Civ. P. 56(a).  Once the moving party meets its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing that a genuine issue of material fact exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  Only disputes over facts which might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. Id. at p. 248.  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247-48 (emphasis in original).

If a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate.  Id.  However, the moving party is entitled to judgment as a matter of law if the nonmoving party failed to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In such a case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at p. 323.

In determining whether summary judgment should issue, the facts and inferences from those facts must be viewed in the light most favorable to the nonmoving party.  Matsushita, 475 U.S. at 587-88.  The key inquiry is

"whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at pp. 251-52.

## B. Plaintiff's FCRA claim

As noted above, defendant raises three arguments against plaintiff's FCRA claim. The court first addresses defendant's renewed questioning of plaintiff's standing to bring that claim. In its June 2017 order on defendant's motion to dismiss plaintiff's federal claims, the court concluded plaintiff had standing to bring his FCRA claims. (Docket 33 at pp. 5-18). In a footnote in its summary judgment brief, defendant asserts plaintiff was not harmed by "any infirmities" in its FCRA disclosures related to the First Advantage background check. (Docket 72 at p. 24 n.8). After summary judgment briefing concluded, defendant filed a letter brief notifying the court of the United States Court of Appeals for the Eighth Circuit's decision in Auer v. Trans Union, LLC, which it asserts "mandates the dismissal of [plaintiff's] claim . . . for lack of standing." (Docket 82 at p. 2); see 902 F.3d 873 (8th Cir. 2018). Plaintiff argues Auer does not dislodge the court's previous standing determination. (Docket 83 at p. 2). The court concludes Auer requires dismissal of plaintiff's FCRA claim for lack of standing.

### 1. Standing law & Auer

"Standing . . . is a jurisdictional requirement, and thus 'can be raised by the court sua sponte at any time during the litigation.'" Pucket v. Hot Springs Sch. Dist. No. 23-2, 526 F.3d 1151, 1156-57 (8th Cir. 2008) (quoting Delorme v.

10

United States, 354 F.3d 810, 815 (8th Cir. 2004)). "[T]he 'irreducible constitutional minimum' of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). As in Spokeo, the standing issue in this case concerns plaintiff's injury in fact in the context of alleged FCRA violations.

"Injury in fact is a constitutional requirement, and it is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." Id. at 1547-48 (quotation omitted). "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." Id. at 1548 (quotations omitted). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." Id. (quotation omitted). "A 'concrete' injury must be *de facto*; that is, it must actually exist." Id. (citation omitted). "Article III standing requires a concrete injury even in the context of a statutory violation. For that reason, [plaintiff] could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." Id. at 1549. "A violation of one of the FCRA's procedural requirements may result in no harm." Id. at 1550.

11

In Auer, the Eighth Circuit considered whether a plaintiff who authorized her employer to conduct a background check had standing to allege FCRA violations resulting from the check. 902 F.3d at 877-78. It concluded Auer did not. Id. at 877. Because Auer consented to the background check, the Eighth Circuit concluded she suffered no intangible harm to the privacy interests protected by the FCRA. Id. at 877-78 (citing 15 U.S.C. § 1681b(b)(2)(A)). "Auer's alleged injury to her personal security and identity information" were likewise without standing because she did not allege any concrete harm resulting from her employer's allegedly negligent storage of her background check results. Id. at 878. The Eighth Circuit concluded "whether or not [consumer reporting agency] met all of its statutory obligations before furnishing the report, no concrete harm came of the transaction." Id. at 880.

With these principles in mind, the court considers again whether plaintiff has standing to allege his FCRA claim.

### 2. Plaintiff's standing

Plaintiff's second amended complaint asserts three violations of the FCRA. First, he alleges defendant "failed to provide a clear and conspicuous written disclosure in a document that consists solely of that disclosure to Plaintiff, that a consumer report may be obtained for employment purposes[,]" violating 15 U.S.C. § 1681b)(b)(2)(A)(i)  (Docket 35 at ¶ 76). Second, plaintiff alleges defendant "failed to obtain a valid authorization to procure a consumer report for employment purposes from Plaintiff[,]" violating 15 U.S.C. § 1681b(b)(2)(A)(ii).

12

Id. Finally, plaintiff alleges defendant "failed to provide Plaintiff with the required notice and a copy of the consumer report upon which it based its decision to take adverse employment action against Plaintiff, within the timeframes requested under the FCRA" and "failed to provide Plaintiff with a written summary of his FCRA rights prior to taking adverse employment action against him," violating 15 U.S.C. § 1681b(b)(3)(A). Id.

Plaintiff admits to facts that negate his second and third FCRA allegations. As to the third allegation, plaintiff now admits to receiving a copy of the First Advantage report, the FBI criminal history report, and an FCRA rights summary before his termination. (Docket 58 at ¶¶ 38-40). Having admitted these facts, he cannot establish a violation of 15 U.S.C. § 1681b(b)(3)(A).[5] It is also undisputed that plaintiff authorized defendant and First Advantage to conduct a background check. (Dockets 58 at ¶ 29 & 52-9). Plaintiff electronically executed the consent form on January 12, 2011. (Docket 52-9). On that same day, he also completed an application form to provide First Advantage with the necessary information to complete the check. (Dockets 58 at ¶ 30 & 52-10). Plaintiff does not argue he did not understand the 2011 consent form or

---

[5]In the second amended complaint, plaintiff does not contest the adequacy of the FCRA rights summary. He argues defendant "failed to provide Plaintiff with a written summary of his FCRA rights[.]" (Docket 35 at ¶ 76). It is now undisputed that defendant provided a written FCRA summary.

application or that they were fraudulent.[6]  This admission establishes there was no violation of 15 U.S.C. § 1681b(b)(2)(A)(ii).

Auer fatally undermines plaintiff's remaining FCRA allegation.  Because plaintiff admits he authorized defendant's background check, Auer governs this claim.  Auer, like plaintiff, "consented to [defendant's] background check[.]" Auer, 902 F.3d at 877.  Pointing to the availability of consent as a defense to common law suits for invasion of privacy, the Eighth Circuit held Auer lacked standing to pursue her FCRA privacy claim specifically because she consented to the background check.  Id. at 877-78.  In the court's prior order finding standing, it held plaintiff "sufficiently showed risk of harm to his informational and privacy rights granted" by the FCRA.[7]  (Docket 33 at p. 17).  This holding is

---

[6]Plaintiff does argue a consent form he executed at the time of his hiring was fraudulent in part.  Docket 57 at pp. 13-16; see also Docket 60-16.  That consent form was undated (the timestamp it bears appears to be from a discovery cataloguing system, as the date is after plaintiff's termination and the beginning of this suit) but does not refer at all to First Advantage, which conducted the 2011 background check.  See also Docket 32 at p. 3 (defendant stating the allegedly fraudulent consent form dates to 2007).  Furthermore, plaintiff contends the fraudulent aspect of the form is that it indicates he denied being convicted of a crime of dishonesty.  (Docket 57 at p. 14).  Plaintiff agrees he submitted the consent form.  (Docket 58 at ¶ 16).  Controversy over this document does not affect the court's conclusion plaintiff consented to the 2011 background check conducted by First Advantage.

[7]Auer does not specifically address violations of the FCRA right to a copy of the consumer report used as a basis for adverse employment action and to a summary of the consumer's FCRA rights.  See Docket 33 at pp. 14-16 (finding plaintiff had standing to allege violation of FCRA informational right) (citing 15 U.S.C. § 1681b(b)(3)(A)).  However, as noted above, plaintiff now admits to receiving a copy of the statutorily required documents before his termination. (Docket 58 at ¶¶ 38-40).  Whether the court's previous finding plaintiff has standing to allege a violation of the FCRA informational right survives, Auer is immaterial because he admits no such violation occurred.

contradicted by Auer.  Because plaintiff consented to the 2011 background check, whatever risk of privacy harm defendant's alleged FCRA violations caused him is insufficient to establish standing.  Auer, 902 F.3d at 877.

Plaintiff argues Auer "presents nothing to this Court which has not already been reviewed and decided on."  (Docket 83 at p. 2).  Although it is true the court already ruled once on plaintiff's standing on his FCRA claim, plaintiff's response does not grapple at all with the new law presented by Auer.  Plaintiff might, as he argued in his earlier briefing, assert that his termination is concrete injury enough to establish standing for his FCRA claim.  (Docket 30 at p. 3).  But his termination did not result from the alleged FCRA violations.  Plaintiff's real quibble is with defendant's use of the criminal history it obtained via its 2011 background check.  His termination is not "fairly traceable to the challenged conduct of the defendant"—any FCRA violations defendant and First Advantage allegedly committed while generating the criminal history—and cannot serve as an injury-in-fact for standing purposes on the FCRA claim. Auer, 902 F.3d at 880 (quoting Spokeo, 136 S. Ct. at 1547).

Plaintiff does not attempt to distinguish Auer's holding that consent to a background check obviates standing in the FCRA privacy right context.  The court sees no basis to distinguish Auer.  Here, as in Auer, plaintiff contends the 2011 consent form he signed violated the FCRA by not "making 'a clear and conspicuous disclosure' that [his] 'consumer report may be obtained for employment purposes.'"  902 F.3d at 877 (quoting 15 U.S.C. § 1681b(b)(2)(A)(i)).

15

Faced with these same facts, the Eighth Circuit found no standing. The court is bound by that determination here. In light of Auer, the court must vacate its previous finding plaintiff has standing to pursue his FCRA claim. The court now finds plaintiff cannot allege a concrete "intangible injury to [his] privacy that is sufficient to confer Article III standing." Auer, 902 F.3d at 877. Accordingly, the court lacks subject matter jurisdiction over plaintiff's FCRA claim. Id. at 880. The court grants summary judgment to defendant on plaintiff's FCRA claim, which is dismissed with prejudice.

### C. South Dakota tort claims

Jurisdiction over plaintiff's South Dakota tort claims was based on 28 U.S.C. § 1367(a), which permits federal courts to exercise supplemental jurisdiction over state law claims sufficiently related to the federal claims. (Docket 1 at ¶ 8). The court has no independent diversity jurisdiction over plaintiff's state law tort claims. See, id. at ¶¶ 1-2 (asserting both parties are residents of South Dakota). The court's determination it has no subject matter jurisdiction over plaintiff's FCRA claim persuades the court to remand his state law tort claims to state court.

The supplemental jurisdiction statute states a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "It is within the district court's discretion to exercise supplemental

jurisdiction after dismissal of the federal claim."[8]  Quinn v. Ocwen Fed. Bank FSB, 470 F.3d 1240, 1249 (8th Cir. 2006).  When "resolution of the remaining claims depends solely on a determination of state law, the Court should decline to exercise jurisdiction."  Glorvigen v. Cirrus Design Corp., 581 F.3d 737, 749 (8th Cir. 2009) (quotation omitted).  "In deciding whether to remand a case in this context, the courts consider 'factors such as judicial economy, convenience, fairness and comity.' "  Id. (quoting Quinn, 470 F.3d at 1249).

These factors weigh in favor of remanding the remaining state law tort claims to the state court.  The parties litigated this case for years in the state court, which already granted summary judgment on two of plaintiff's tort claims.  See supra Section I.B.  That court is already familiar with the facts in this case.  Remanding this case would serve the interests of judicial economy and comity.  The court also notes defendant may raise its conflict preemption defense before the state court.[9]  The court discerns no unfairness to the parties in a remand.  The court denies defendant's motion for summary judgment as to plaintiff's state law tort claims.

---

[8]Authority suggests dismissal of supplemental state claims is mandatory after a court determines it lacks subject matter jurisdiction over the primary federal claim.  See 14D Charles A. Wright & Arthur R. Miller, Fed. Practice & Procedure § 3567.3 (3d ed.) ("If [the federal] claim failed to invoke an independent basis of subject matter jurisdiction, then there was nothing to which supplemental jurisdiction could have attached.").  Because the court concludes it should remand the remaining claims to the state court as an exercise of its discretion, it need not consider whether a remand is mandatory or discretionary in this circumstance.

[9]The parties did not provide the court with the state court's rationale for granting partial summary judgment to defendant.  The court expresses no view as to the merits of the defense.

### III. Defendant's Motion to Exclude Expert Testimony

Given the court's disposition of this case, defendant's motion to exclude testimony by plaintiff's expert is denied as moot. The court expresses no view as to the merits of the motion, leaving that matter for the state court if defendant chooses to raise it there.

### ORDER

For the above reasons, it is

ORDERED that defendant's motion for summary judgment (Docket 47) is granted in part and denied in part.

IT IS FURTHER ORDERED that plaintiff's FCRA claim (Docket 35 at ¶¶ 65-92) is dismissed with prejudice.

IT IS FURTHER ORDERED that plaintiff's remaining state law tort claims (Docket 35 at ¶¶ 1-64, 175-77) are remanded to the Seventh Judicial Circuit Court, Pennington County, South Dakota, pursuant to 28 U.S.C. § 1367(c)(3).

IT IS FURTHER ORDERED that the Clerk of Court shall provide a copy of this order to the Clerk of Court, Seventh Judicial Circuit Court, Pennington County, South Dakota.

IT IS FURTHER ORDERED that defendant's motion to exclude expert testimony (Docket 45) is denied as moot.

Dated March 21, 2019.

BY THE COURT:
/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE